## Shropshire Evans *v.* The State.

1. **Testimony of Absent Witness.**—The Code of Procedure, in article 772, prescribes five alternative contingencies upon which a predicate may be laid for the introduction in evidence of a deposition made by a witness before an examining court or a jury of inquest. Unless the predicate be laid in conformity to one or more of these prescribed contingencies the deposition of an absent witness is not admissible. *A fortiori,* it is not competent, without such a predicate, to reproduce oral testimony previously given by the absent witness. *Sullivan v. State,* 6 Texas Ct. App. 319, *contra,* is hereby overruled. On this subject the Code is restrictive of the common law.

2. **Same — Case Stated.**—In a trial for murder the State proved as a predicate the absence of a material State's witness who had testified orally at a *habeas corpus* trial of the cause, but had since left for parts unknown, and for whom the State had ineffectually searched and sued out process. On this as a predicate the State was allowed, over objection by the defense, to prove by a witness the oral testimony given by the absent witness at the *habeas corpus* trial. *Held,*

error. The predicate laid does not conform to any of the requirements of article 772 of the Code of Procedure, and therefore would not warrant the introduction of even the deposition of the absent witness, if it had been legally taken. The predicate might suffice at common law, but not under the provisions of our Code of Procedure, by which alone the question is determinable in this State.

APPEAL from the District Court of Dallas. Tried below before the Hon. E. G. BOWER, Special Judge.

The indictment was presented June 19, 1876, and charged that the appellant, Shropshire Evans, on May 1, 1876, with a gun and of his malice aforethought, did kill and murder one William Engers. The jury found the appellant guilty of manslaughter, and assessed his punishment at a term of two years in the penitentiary..

The statement of facts sets out as a fact proved that the defendant killed William Engers in Dallas county, on April 6, 1876. It next proceeds to state that on November 17, 1875, the defendant rented a part of his farm to the deceased upon terms specified in a written contract set out in the record. This written contract purports to lease to Engers fifty acres of land, including thirty acres cultivated the preceding year and three acres not cultivated since the year previous. The remainder of the fifty acres was grass land. Engers was also to have the use of the house in which the defendant was living at the time of the lease, which was to expire at Christmas, 1876. The land leased to the deceased was part of the defendant's farm, which was on a tract known as the J. J. Beeman survey. The difficulty which culminated in the homicide grew out of a controversy about three acres of ground which the deceased claimed under his lease, and which the defendant claimed was no part of the land he had leased to the deceased. The defendant lived near but not on the leased premises at the time he killed the deceased.

Richard Bruton was the first witness introduced by the

State.   He testified that, on the morning of the homicide,
he was at his residence, which was fifty or sixty yards
from the southeast corner of the Beeman survey.   Look-
ing across the prairie he observed Engers, the deceased,
plowing across a part of the defendant's field.   (By
other testimony it appears that this part was the three
acres in controversy between the deceased and the de-
fendant.)   A few minutes afterwards the witness saw
the defendant and his two little boys just outside the field,
and nearly opposite where deceased was plowing.   The
defendant, as witness noticed him, seemed to arise from
behind the fence, and started to his house.   On account
of some intervening trees the witness could not then see
the deceased or the spot at which he was killed.   He saw
the wife of defendant standing near the corner of the lat-
ter's house.   About eight o'clock the witness saw the
body of the deceased lying behind his plow.   He had been
laying off corn-ground.   Witness saw the body examined.
A half-ounce ball had entered the left breast below the
nipple, and ranged upwards to the edge of the right
shoulder blade, where it was taken out.   Mrs. Engers,
Miss Wideman and another lady were at the body when
witness reached it.

On cross-examination the witness stated that he heard
no gun, though he could have heard one at that distance
if everything had been still.   He could not recognize the
features of the defendant where he was near the fence,
but knew his walk well and was confident it was him and
his two little boys he saw.   The elder of the boys was
about twelve years old, and was named Ben; the younger
was about seven.   Witness often saw the defendant feed-
ing stock in a small pen in the northeast corner of the
field, but saw no mule in the pen the morning of the
homicide.   Witness had heard that the deceased and
the defendant had had a previous difficulty, and that the
latter had had the land surveyed.   Witness stated that he

had no friendly feelings towards the defendant, and for a year before the homicide had had no friendly intercourse with him. Witness had done all he could to aid the prosecution in this case, and to secure the conviction of the defendant. He had given the State's attorney all the information he could.

Dr. Bohannan, for the State, testified that he reached and examined the body of the deceased about an hour after the killing. The ball had entered to the right of the left nipple, and passed through the lung, the base of the heart, and the back-bone, severing the spinal chord. It was a half-ounce ball, and was taken out by witness. Deceased was lying in the furrow, behind the plow, with his feet within a foot or two of the plow. Witness was not positive that the plow-line was still around the deceased's neck, but that was his recollection. Deceased could not possibly have moved nor spoken after he was shot. Richard Bruton, Mrs. Engers and a young German were at the body.

W. F. Cummins, a surveyor, testified, for the State, that he, about two months after the killing, surveyed the land leased by defendant to deceased. The lines were shown him by the county attorney and Richard Bruton. A diagram of his survey was shown to and identified by the witness as one made by himself. There was other land in the field besides that shown in the diagram.

J. D. Miller, for the State, testified that, on the Tuesday next before the Thursday on which the killing occurred, he met the defendant and asked him how he and his tenant were getting along; to which the defendant replied that they were getting along very well if he could only keep his tenant on his own land. Defendant said that Engers needed killing, or that he, defendant, would have to kill him,— or something like that.

G. W. Glover, for the State, testified that on the morning of the killing the defendant came to the house of

witness and told him that he, the defendant, had shot a Dutchman who was plowing in his, defendant's, garden, and he asked the witness as a neighbor to go to the place and see about it.   Defendant said that he was going to Dallas to give himself up.   Witness went and found the dead man in the defendant's garden, lying in a furrow and about two feet behind his plow.

Mrs. Gertrude Benson, for the State, testified that she was the wife of Engers at the time he was killed.  Albert Ochner came to the house and told her that Engers was killed, and she took some water and went to him.   Ochner went with her.   They found Engers dead in the field, behind his plow.   No one else was then there.   Witness did not move the body; she found no weapon on it.   Deceased had a gun and a pistol, but they were at the house; witness saw them there after the deceased and Ochner had gone to the field to plow.   Ochner left the country in 1876, and witness had tried to learn where he could be found, but had not been able to hear anything about him.

On her cross-examination the witness said that she heard a gun-shot report some fifteen or twenty minutes before Ochner came to the house.   Deceased and Ochner were plowing in the field when she heard the gun.   They sometimes took the gun to the field, to shoot birds and rabbits, but they did not take it the morning of the killing.   When witness left the house to go to the deceased, the pistol was hanging on the wall near the clock, where it usually hung, and the gun was lying on some corn in the corner.   Witness did not remember whether Ochner, when he came to tell her that Engers was shot, came into the house or not; but he may have done so. Witness came from the body to the house along with Miss Wideman, and put the pistol and a pocket-book under the head of the bed, because there was no lock on the door; and then she returned to the body.   After-

wards she and Miss Wideman, with Mrs. Walworth and probably some other ladies, came to the house, and witness, in preparing the bed for the body of the deceased, took the pistol from under the bed and hung it back on the wall. In the course of her testimony this witness stated that Engers had a coat on when he was shot, and that it was perforated by the ball which killed him. She said that she did not take the coat off of him, and did not know who did. She admitted some discrepancy between her present testimony and that which she gave at the hearing of the case on *habeas corpus*, soon after the homicide; but she reasonably accounted for such discrepancies by her distress and her ignorance of the English language at the time of the *habeas corpus* trial.

As will be seen in the opinion of this court, the State was allowed to prove by a witness the testimony which Ochner gave at the *habeas corpus* trial. The admission of this proof raises the questions upon which the case is disposed of, and the opinion sets out the testimony reproduced.

The State proved and introduced the rental contract between the deceased and the defendant, and also the latter's receipt to the former for $150 in payment of the rent. The contract and the receipt bore the same date, November 17, 1875.

John Humphreys, for the State, testified that the defendant, a few days before the homicide, told witness that as he, defendant, had then laid off to Engers the ground the latter was entitled to, the law would not hurt him if he should kill Engers in case the latter came over the line. At defendant's request the ground was measured off by A. A. Kennedy, George Quinn, and witness, with a rope. On cross-examination the witness stated that about the time he and the others were concluding the measurement of the ground, the deceased asked them what they were doing there, and, after he was told what

they were doing, he inquired if either of them was the county surveyor, and they told him no.  He then said he had nothing to do with them or their measurement, and did not intend to be bound by it.  Defendant showed deceased the lines and stakes and told him not to cross the line; and he replied that he would cross the line, and that he was not bound by any line they had run.  Defendant said something about the land being laid off according to law; and the deceased replied that he would have his land in spite of the defendant and the law.  Speaking to the defendant the deceased said "d—n him and the law," and that he didn't care for him or the law.  The witness explained the way the measurement ran, and stated that it cut off a part of the ground which the deceased had plowed, and assigned to him some unbroken ground in lieu of the part cut off.  Witness noticed two or three small fruit trees which had been plowed up by the deceased, but not any ground like a garden, except some potatoes and peas which were twenty or thirty feet distant from the ploughed ground and separated from it by unbroken land.  Defendant told witness that he had gone to town and got a warrant for the arrest of the deceased on a charge of assault.

Several other witnesses were examined in behalf of the State, but their testimony adds nothing important to be related.

The defense introduced W. Derritt, who seems to have been an officer, and who testified that a warrant for the arrest of Engers and Ochner for assault was placed in his hands a few days before the killing.  Witness did not find Engers at the latter's home, but found and arrested Ochner, who gave bail.

Henry Rodgers, for the defense, testified that Engers, about a week before he was killed, said that the defendant had come into the field and stuck his finger in his, the deceased's, face, and that he, the deceased, struck the

defendant in the face two or three times and knocked
him down, and he didn't come any more; that he, the
deceased, had heard that the defendant was a coward and
wouldn't fight, and he, the deceased, intended to have all
the land in spite of the defendant or the law, and if de-
fendant came fooling around him any more he would eat
him up for breakfast.

G. W. Quinn, for the defense, stated what occurred when
he and Kennedy, and the State's witness, Humphrey,
meas ired off the leased ground at defendant's request,
about a week or ten days before Engers was killed.   De-
ceased was on the ground and saw it run off.   Defendant
told deceased not to cultivate beyond the line.   Deceased
said in a threatening manner that he was going to
have it all, and asked if witness and the others were
county surveyors.   Being told they were not, he said he
had nothing to do with the measurement they had made,
and he intended to have his land in spite of defendant or
the law; he said d—n the defendant and the law,— that
Texas didn't have any law.   Deceased was a stout young
man about thirty years old and weighed about 180
pounds.   Defendant's weight was about 135.   He had a
small young orchard in the field, and some of the fruit
trees had been ploughed up.

Mrs. Labon, formerly Mrs. Walworth, testifying for
the defense, stated that she went to the deceased's body
the morning he was killed, and after remaining there
about an hour she and her husband went to the deceased's
house after some water.   There was then no pistol hang-
ing on the wall near the clock or elsewhere.   She saw the
shot-gun in the corner.   After staying at the house about
half an hour she and her husband went back to where
the deceased lay, and where they had left Mrs. Engers
and Miss Wideman.   Mrs. Engers was still there when
they returned from the house.   About four o'clock in the
afternoon, Mrs. Engers, Miss Wideman, witness and

others went to deceased's house together, and made some changes about the bed for the reception of the body of the deceased.   The first thing done was by Mrs. Engers taking the pistol from under the head of the bed and hanging it on the wall near the clock.   Witness was positive that this was the first time that Mrs. Engers had gone to the house from the body of her husband.

A. S. Jamin, for the defense, testified that the deceased, some time before the killing, said he could and would whip the defendant if the latter fooled with him.   Only a few days before the killing the deceased told witness that his hired hand, a German, was plowing near the defendant's house, and defendant came to the German and told him he must not plow there, to which the latter replied that the defendant was not his boss; and then the German came and told him, the deceased, about it, whereupon he went to the field, and the defendant came out, shook his fist in his face, and then he knocked the defendant down.   Deceased was often at witness's house, and almost always talked about the defendant, and said he was bound to have a difficulty with defendant.

The defense reproduced the testimony given at the *habeas corpus* trial by Daniel Quinn, since deceased.   It was to the effect that, on the day before the killing, he put a mule in the little pen in the corner of defendant's field, and requested the defendant's son Ben to feed it until witness came back from his home.   On the day Engers was killed, but after that occurrence, the witness went and got his mule.

Mrs. Evans, the wife of the defendant, recapitulated the controversy and trouble between him and the deceased in consequence of the latter plowing ground he was not entitled to.   About sunrise on the morning of the homicide the witness saw the deceased going to plow in the disputed ground.   She was then at the house, which was 150 or 200 yards from the corner of the field.   She saw

the deceased stop his team and put down a gun near where defendant's garden was planted and about where the line had been measured, and then saw the deceased commence plowing across the ground. Defendant went down to the corner of the field for the purpose of feeding Mr. Quinn's mule which was there in the pen. While deceased was plowing the third furrow and coming towards the fence, the defendant got over into the garden and went to the deceased. Hearing loud talk between them and fearing trouble, the witness went down towards them and to where she could see clearly. Defendant told the deceased to quit plowing on his, defendant's, ground. Deceased cursed and threatened the defendant, and told him the neighbors said he was a coward, and he, deceased, would hurt him and hurt him bad, and to clear out. Deceased told defendant he would have the land in spite of him or the law, and he intended to have it if he had to kill defendant for it. He struck the defendant and drove him out of the field, following him towards the fence. Defendant got on the fence, and the deceased returned to his plow, and told defendant he wouldn't fight, daring him to come back and fight him. Defendant told deceased he had a writ out for him, and would put the law to him. Ben, the young son of defendant and the witness, had gone with a gun to hunt wild geese which used to light about a half or three-fourths of a mile from the house, and at this time was returning home and passed near where the defendant was sitting on the fence. Defendant got off the fence and took the gun from Ben. More words then passed between the deceased and the defendant, when the former drew his pistol and the latter fired with the gun. At the moment the witness did not know which of them fired. The deceased made the first demonstration to shoot, and was making motions to get his pistol at the time defendant was getting the gun. Defendant made no demonstration with the gun

until after the deceased drew his pistol.   The witness was positive she saw the deceased draw his pistol.   At that time she was about fifty yards distant, and could see perfectly.   Ben was close to the parties.   Deceased had his coat on, but whether he got his pistol from the pocket of his coat or from his hip-pocket, the witness could not say. Defendant, after the shooting, said he was going to Dallas to give himself up, and then left.   The witness went back to her home and, looking out of the window, saw Ochner, the hired hand of the deceased, go to the latter's body and turn it about, and then he carried away with him a little bundle and something that looked like a pistol.   Then Ochner went to where the deceased had left the gun, picked it up, and ran off towards the house of the deceased.   (In setting out the testimony of the widow of the deceased it should have been stated that she said that Ochner, when he came and told her of the killing, said he had gone to the body of the deceased.) Afterwards Ochner, accompanied by Mrs. Engers, came to the body.   This witness and others stated that the deceased frequently had his gun with him in the field.

Ben Evans, the defendant's son, testifying for the defense, explained the lease transaction and differences between his father and the deceased.   Early in the morning of the killing he went geese-hunting, as stated by his mother, and on his way home he directed his course towards the little pen in the corner of the field, to see after Quinn's mule, which had been left in the pen.   When he got within 100 yards of the deceased and the defendant, he heard them quarreling, 25 or 30 feet inside of the field. The subsequent incidents of the homicide were stated by this witness in substantial accordance with the account of them previously given by his mother,— except that in some particulars his account of them was more explicit than hers.   He stated that when the defendant got over the fence and outside the field, the deceased went back to

his plow, put his hands behind him, and drew a pistol. Witness was then five or six steps outside the fence, and had just got there. Defendant stepped up to him and took his gun, and then, holding the gun in his right hand and by his side, he stepped a little towards the fence and told the deceased he would put the law in force against him. Deceased replied "I'll fix you, and that d—d quick," and presented his pistol. Then the defendant fired and the deceased fell. The gun which was used by the witness in hunting was an old Enfield rifle, and the only gun ever about the place of his father. Witness always shot balls out of it, and had no other kind of shot. On his cross-examination this witness stated that Ochner came to the deceased soon after the latter fell.

The foregoing recapitulation is greatly condensed from the elaborate statement of the testimony, and necessarily omits many details which were doubtless deemed significant in the presentation of the case to the jury.

No brief for the appellants has reached the Reporters.

*H. M. Holmes*, for the State.

Willson, J. The defendant was indicted for the murder of William Engers, and was convicted of manslaughter, and his punishment assessed at two years' confinement in the penitentiary.

It appears from the testimony that Engers had rented land of Evans, and there arose a dispute between them as to a certain portion of the land, whether or not that particular portion of the land was embraced in the contract. This dispute engendered bad feeling between the parties, and a few days prior to the killing they had a difficulty in the field, in which difficulty Engers had struck Evans and knocked him down. On the occasion of the killing, Engers was plowing in the field, and was plowing the land

in dispute, that is, the land which both parties claimed to be their land. There was another party in the field at the time, one Albert Ochner, who was the hired laborer of Engers. Evans shot and killed Engers. There is no dispute about the killing.

Evans claims that he killed Engers in self-defense. The evidence in regard to the cause and circumstances of the killing is conflicting. It is claimed by Evans, and testified to by his wife and his son, who state that they were present and saw the killing, that Engers was armed with a pistol, and that he was endeavoring to shoot Evans at the time Evans shot him. It is claimed on the part of the State, and testified to by the wife of Engers and another witness, that Engers at the time of the killing was unarmed, and that his pistol was at his house, hanging up in the house, and that he had but the one pistol. The man Ochner was the first person to reach deceased after he was shot, and he went from deceased to deceased's house before any one else had reached the dead body.

The theory of the defense is, that this man Ochner took the pistol which Engers had, and also a gun which Engers had in the field, and carried them to the house. In fact this is the testimony of the wife and son of Evans. Ochner was not present to testify on the trial. There had, at one time, been an examination of the case on *habeas corpus*, and upon that examination Ochner had testified. It was proved that since Ochner testified in the case he had left the country, and that his whereabouts were unknown; that diligent inquiry had been made to find him by the prosecuting attorneys and the family of deceased; that process had been issued for him, but that all these efforts to find him had proved unavailing. It was shown that, when this witness was examined on the *habeas corpus* trial, the defendant Evans was present in person and by counsel, and that defendant's counsel cross-examined the witness. Upon this predicate the State offered to

prove the statements made by Ochner upon his examination on the *habeas corpus* trial.

The defendant objected upon the ground that a sufficient predicate had not been laid for the admission of the evidence. The objection was overruled, and G. N. Aldredge, a witness for the State, was permitted to detail the testimony of Ochner, as follows: "He stated that he was working, on the morning of the killing, in the same field where deceased was, about 400 yards distant from him; that he heard a gun fire, and looked and didn't see deceased; that he then went to where he was, and found his body lying behind the plow, a little in the furrow and a little quarterly; that he raised him up, and said he asked him who shot him, and deceased gasped 'Evans,' his last words. He did not pretend to say that he saw the shooting. There was a rise in the ground between him and deceased. He saw defendant, after the shooting, going towards the house with a gun. He stated that deceased had no coat, nor did he find any arms on his body; that the gun of deceased was at his home, and his pistol was hanging on the wall by the clock; that he went to the house from the body and told Mrs. Engers; that she came to the body, and that he got a bucket of water and followed her," etc. It will be seen from this statement of the case that the testimony of Ochner bears directly and positively upon the main issue in the case, and is therefore material. Was this evidence properly admitted?

The testimony of Ochner was oral, and was not required to be reduced to writing, signed and certified, as in the case of trials before examining courts. There is no provision of our statutes expressly governing such testimony where it is oral, but we have a statute expressly regulating such testimony where it has been reduced to writing; and we are of opinion that we should look to this statute, instead of to the common law, as our guide in determining under what circumstances this

character of testimony should be admitted. If we go to the common law for the rule, we find that such testimony is admissible in the following instances: 1. Where the witness has died since testifying. 2. Where he is beyond the jurisdiction of the court. 3. Where he cannot be found after diligent search. 4. Where he is insane. 5. Where he is sick and unable to testify. 6. Where he has been kept away by the adverse party.

When we refer to our statute for the rule, we find that such testimony, when written, is restricted to the following instances: 1. That the witness resides out of the State. 2. That since his deposition was taken he has died. 3. That he has removed beyond the limits of the State. 4. That he has been prevented from attending the court through the act or agency of the defendant, or by the act or agency of any person whose object was to deprive the defendant of the benefit of the testimony. 5. That by reason of age or bodily infirmity such witness cannot attend. (Code Crim. Proc. art. 772.)

It will be perceived that this statute is restrictive of the common law, and confines this character of testimony within narrower limits. True, the statute expessly refers to this character of testimony where it is reduced to writing, and does not expressly name oral testimony of the same character. But it would be a strange and inconsistent rule that would admit the *oral* in preference to the *written* testimony, and we cannot sanction such a view of the question. We therefore hold that the *oral* testimony is admissible only in cases where, under the terms of the statute, it would be admissible if reduced to writing.

We are aware that in the case of *Sullivan* v. *State*, 6 Texas Ct. App. 319, it was held by this court that the testimony of a witness taken before an examining court might, on any subsequent trial of the accused for the same offense, be introduced as evidence, provided that

after diligent inquiry the witness could not be found or his whereabouts ascertained. This is doubtless correct common law, but after much consideration we conclude that it is not the correct rule under our statute. We are therefore constrained to overrule the opinion in *Sullivan* v. *State,* in so far as it makes testimony of this character admissible under circumstances not expressly provided for in the statute. The learned special judge who presided in the trial of this case in the court below, in admitting the testimony objected to, followed the rule laid down in *Sullivan* v. *State,* and the rule of the common law, and in so doing committed no error as the law was at that time understood; but, nevertheless, as we are of the opinion that the ruling was not in accordance with the law as it really is, and as it should have heretofore been expounded by this court, we must, for this reason, reverse the judgment of the court below.

There are other errors assigned, but they are of such a nature as are not likely to occur on another trial, and we therefore think it unnecessary to determine them.

*Reversed and remanded.*